No. 23-12178

# United States Court of Appeals for the Eleventh Circuit

JEREMY JONES,

*Appellant*,

v.

DAVID CEINSKI, JR.

*Appellee*.

**On Appeal from the United States District Court for the Middle District of Florida, Case No. 8:22-cv-231**

**BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION FOUNDATION AND ACLU FOUNDATION OF FLORIDA IN SUPPORT OF APPELLANT JEREMY JONES**

*Counsel of Record:*
Daniel Tilley
American Civil Liberties Union
Foundation of Florida
4343 West Flagler St., Suite 400
Miami, Florida 33134
(786) 363-2714
dtilley@aclufl.org

*On the Brief:*
Julian Clark
American Civil Liberties Union
Foundation
Criminal Law Reform Project
125 Broad Street, 18th Floor
New York, New York 10004
(929) 969-4365
jclark@aclu.org

*Counsel for Amici Curiae*

## Certificate of Interested Persons
## And Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, the undersigned certifies that, in addition to the persons listed in the certificate of interested persons filed by the parties, the following persons (amici curiae, their parent corporations, publicly held corporations that own 10% or more of the stock, and their counsel) are known to have an interest in the outcome of this case:

American Civil Liberties Union Foundation (Amicus curiae)

American Civil Liberties Union Foundation of Florida (Amicus curiae)

Clark, Julian (Counsel for Amici curiae)

Tilley, Daniel (Counsel for Amici curiae)


Dated: December 6, 2023                    By:    /s/ *Daniel Tilley*
                                                      Daniel Tilley

i

## **Table of Contents**

Table of Authorities ................................................................. iii

Interest of Amici Curiae ............................................................ 1

Statement Pursuant to Fed. R. Civ. P. 29(a)(4)(E) .................................... 1

Summary of the Argument ............................................................ 2

Argument ......................................................................... 3

A.    Introduction ................................................................. 3

B.    Failure to consider disability in the Graham analysis disparately harms Black disabled people because they are disproportionately subjected to police use of force... ......................................................................... 7

C.    This Court should consider an individual's known or evident disability as a central aspect of the facts and circumstances of an incident when determining, under Graham and its progeny, the objective reasonableness of a law enforcement officer's use of force. ................................................................... 11

    a.  This Court should consider an individual's disability when determining whether a reasonable officer would believe the individual poses an immediate threat to the safety of officers or the safety of others. ......................... 13

    b.  This Court should consider an individual's disability when determining whether a reasonable officer would believe the individual was actively resisting arrest or attempting to evade arrest by flight. ..................................... 18

Conclusion ...................................................................... 19

## Table of Authorities

**Cases**

*Bates ex rel. Johns v. Chesterfield Cnty., Va.*,
  216 F.3d 367 (4th Cir. 2000)..................................................................12

*Champion v. Outlook Nashville, Inc.*,
  380 F.3d 893 (6th Cir. 2004) ..................................................................5

*Deorle v. Rutherford*,
  272 F.3d 1272 (9th Cir. 2001) ............................................................5, 12

*Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*,
  810 F.3d 892 (4th Cir. 2016) ...................................................................6

*Estate of Richard Lee Richards v. Remington*,
  No. 22-cv-429, 2023 WL 2503724 (D. Ariz. Mar. 14, 2023) ....................... 14, 15

*Garczynski v. Bradshaw*,
  573 F.3d 1158 (11th Cir.2009) ...............................................................17

*Jones v. Ceinski*,
  No. 8:22-CV-231-AAS, 2023 WL 3726893 (M.D. Fla. May 30, 2023).........3, 16

*Lewis v. Truitt*,
  960 F. Supp. 175 (S.D. Ind. 1997)...........................................................19

*McCray v. City of Dothan*,
  169 F. Supp. 2d 1260 (M.D. Ala. 2001), *aff'd in part, rev'd in part, on other
  grounds*,
  67 F. App'x 582 (11th Cir. 2003) ...........................................................19

*McCullough v. Antolini*,
  559 F.3d 1201 (11th Cir. 2009) ..............................................................13

*Perez v. Suszczynski*,
  809 F.3d 1213 (11th Cir. 2016) ......................................................... 15, 16

*Saucier v. Katz*,
  533 U.S. 194 (2001)..............................................................................11

*Scott v. Harris*,
  550 U.S. 372 (2007)..............................................................................13

*Stephens v. DeGiovanni*,
852 F.3d 1298 (11th Cir. 2017) .............................................................................11

*Tennessee v. Garner*,
471 U.S. 1 (1985) ..................................................................................................11

**Other Authorities**

AMNESTY INT'L, DEADLY FORCE: POLICE USE OF LETHAL DEADLY FORCE IN THE
UNITED STATES 4 (2015),
http://www.amnestyusa.org/pdfs/AIUSA_DeadlyForceExecutiveSummaryJune2
015.pdf ....................................................................................................................8

Ann Pietrangelo, *Stimming: Causes and Management*, HEALTHLINE (June 28,
2019), https://www.healthline.com/health/autism/stimming ...............................17

*APHA Calls Out Police Violence as a Public Health Crisis*, AM. PUB. HEALTH
ASS'N (June 4, 2020), https://www.apha.org/news-and-media/news-
releases/apha-news-releases/2020/apha-calls-out-police-violence ......................10

Brief of ACLU & Am. Diabetes Ass'n et al. as *Amici Curiae* Supporting
Respondent, *City and County of San Francisco v. Sheehan*, 575 U.S. 600 (2015)
(No. 13-1412) ..........................................................................................................6

Camille A. Nelson, *Racializing Disability, Disabling Race: Policing Race and
Mental Status*, 15 BERKELEY J. CRIM. L. 1 (2010) ...............................................8

*Critical Issues in Policing Series: An Integrated Approach to De-Escalation and
Minimizing Use of Force*, POLICE EXEC. RES. F. 1 (Aug. 2012),
https://perma.cc/G5T8-ZRBW. .............................................................................18

David M. Perry & Lawrence Carter-Long, *The Ruderman White Paper on Media
Coverage of Law Enforcement Use of Force and Disability*, RUDERMAN FAM.
FOUND. 1 (Mar. 2016), https://rudermanfoundation.org/wp-
content/uploads/2017/08/MediaStudy-PoliceDisability_final-final.pdf ...............9

Dominic Bradley & Sarah Katz, Opinion, *Sandra Bland, Eric Garner, Freddie
Gray: The Toll of Police Violence on Disabled Americans*, THE GUARDIAN (June
9, 2020), https://www.theguardian.com/commentisfree/2020/jun/09/sandra-
bland-eric-garner-freddie-gray-the-toll-of-police-violence-on-disabled-americans
.................................................................................................................................10

iv

Elinoam Abramov, *"An Autistic Man Lives Here Cops No Excuses . . . Oh Yes He is Black Too": Cognitive Disability, Race and Police Brutality in the United States* (Oct. 2017) ...................................................................................8

*Fatal Force,* WASH. POST, *https://www.washingtonpost.com/graphics/investigations/police-shootings-database/* (last visited Dec. 6, 2023) ....................................................................9

Jamelia N. Morgan, Essay, *Disability's Fourth Amendment*, 122 COLUM. L. REV. 489 (2022) ...........................................................................................9

Jamelia N. Morgan, *Policing Under Disability Law*, 73 STAN. L. REV. 1401 (2021) ...........................................................................................................8

Karsyn Costello, *Disability As "Abnormal": Court Sanctioned Violence Against Individuals with Disabilities*, 57 HARV. C.R.-C.L. L. REV. 755 (2022) ................9

*Law Enforcement Responses to Disabled Americans: Promising Approaches for Protecting Public Safety: Hearing on Law Enforcement Responses to People with Disabilities Before the Subcomm. on Const., Civ. Rts., and Hum. Rts. of the S. Jud. Comm.*, 113th Cong. (2014) (written testimony of Rebecca Cokley, Exec. Dir., Nat'l Council on Disability) ...........................................................................6

Leah Pope & Rebecca Neusteter, *For Mental Health Month, a New Initiative Focused on Serving Safely*, VERA, https://www.vera.org/news/for-mental-health-month-a-new-initiative-focused-on-serving-safely (May 23, 2018) .....................8

*National Health Interview Survey:Sources and Definitions, National Health Interview Survey (NHIS) and Health, United States, 2020–2021*, NAT. CENTER HEALTH STAT, https://www.cdc.gov/nchs/nhis/index.htm (last visited Dec. 6, 2023) ..............................................................................................................14

**Interest of Amici Curiae**

The American Civil Liberties Union Foundation ("ACLU") is a nationwide, nonprofit, nonpartisan organization with nearly two million members and supporters dedicated to the principles of liberty and equality embodied in our nation's Constitution and civil rights laws. The ACLU's Criminal Law Reform Project ("ACLU-CLRP") engages in litigation and advocacy throughout the country to protect the constitutional and civil rights of criminal defendants and end harsh crime policies that result in mass incarceration and criminalization. The American Civil Liberties Union of Florida ("ACLU-FL") is a state affiliate of the ACLU.

**Statement Pursuant to Fed. R. Civ. P. 29(a)(4)(E)**

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) amici represent that:

(i) No party's counsel authored this brief in whole or in part;

(ii) No party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and

(iii) No person—other than the *amici*, their members, or their counsel—contributed money that was intended to fund preparation or submission of this brief.

1

## Summary of the Argument

This case raises issues of critical importance to the Fourth Amendment right to be free from excessive force. It has significant implications for the constitutional protections afforded to disabled individuals, especially those with other marginalized and subordinated identities, who are subjected to use of force by law enforcement.

Amici urge this Court to (1) reverse the District Court's grant of summary judgment, and (2) consider an officer's knowledge of an individual's disability as a central aspect of determining, under *Graham v. Connor*, 490 U.S. 386 (1989) and its progeny, the objective reasonableness of a police officer's use of force.

The *Graham* Court explained that to determine the reasonableness of use of force, a court should consider *all of the facts and circumstances* of each particular case, including the (1) severity of the offense of which an individual is suspected; (2) whether the individual poses an immediate threat to the safety of the officers or others; and (3) whether he individual is actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 396. Critically, the *Graham* objective-reasonableness standard permits consideration of disability as a relevant fact and circumstance in determining whether a particular use of force was reasonable.

Here, even if Mr. Jones's disability is not considered, all three *Graham* factors decisively favor Mr. Jones. Officer Ceinski's use of force was unreasonable and

excessive under clearly established law. Accordingly, this Court should reverse the District Court's grant of summary judgment. But this Court should not stop there. To adequately protect the Fourth Amendment rights of disabled individuals pursuant to *Graham*, this Court must incorporate disability into its excessive-force jurisprudence. By not accounting for how an evident or known disability, or disability-related behaviors, may be misinterpreted as posing a threat or resisting arrest, this Court's excessive-force doctrine fails to appreciate the nature and scope of disability. It also perpetuates the notion that an inability to conform to dominant societal norms may be a constitutionally permissible basis for a police officer's use of force.

## Argument

### A.    Introduction

Mr. Jeremy Jones is a Black disabled man with severe osteoporosis and a congenital hand deformity.[1] On August 8, 2020, while Mr. Jones was driving with a friend, he was pulled over for a minor traffic offense by David Ceinski, a deputy with the Sarasota County Sheriff's Office in Sarasota, Florida. Officer Ceinski ordered Mr. Jones out of his car, and Mr. Jones complied. Then, upon being asked by Officer Ceinski whether there were any weapons in the car, Mr. Jones told Officer

---

[1] All facts in this paragraph come from Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (Dist. Ct. ECF No. 40 at 2–4). *Jones v. Ceinski*, No. 8:22-CV-231-AAS, 2023 WL 3726893 (M.D. Fla. May 30, 2023).

3

Ceinski that he had a license for a handgun that he kept in his car's center console. Even though Mr. Jones had an evident hand-function disability, possessed a license for the gun on his person, and was standing outside the car (and thus couldn't access the gun quickly), Officer Ceinski grabbed Mr. Jones, twisted his arm, put him in a chokehold, and struck him once on the head. Mr. Jones suffered an umbilical hernia and psychological trauma as a result of the encounter.

Mr. Jones sued Officer Ceinski for excessive force, amongst other claims. But the District Court granted Officer Ceinski's motion for summary judgment, finding (1) that Officer Ceinski arguably used *de minimis* force in the arrest; and (2) in any event, the presence of the gun—even if lawful—created enough of a safety risk that Officer Ceinski's use of force was reasonable under the circumstances. In reaching this holding, the District Court failed to properly analyze all three *Graham* factors, which heavily favor Mr. Jones *and* establish Officer Ceinski's use of force was unreasonable and excessive under clearly established law. The District Court also failed to consider evidence of Mr. Jones's known disability in its objective reasonableness analysis.

*Graham* sets forth the constitutional standard for reasonable force by police. Specifically, the *Graham* Court ruled that Fourth Amendment excessive-force claims are "analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). Under *Graham*, "the

4

question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. As the Court has noted, reviewing courts must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Although the plaintiff in *Graham,* Dethorne Graham, is a Black disabled man, his disability, the role it played in the encounter, and how it shaped the officers' subsequent justifications for their use of force, does not feature prominently in the majority opinion. Nevertheless, *Graham* and its progeny does not foreclose consideration of disability as a relevant fact and circumstance in determining whether a particular use of force was reasonable.

Notably, other circuit courts have determined that disability should be considered in assessing the reasonableness of an officer's use of force and opted to incorporate disability in to their excessive-force jurisprudence. *See, e.g., Deorle v. Rutherford,* 272 F.3d 1272, 1283 (9th Cir. 2001) ("when it is or should be apparent that an individual is emotionally disturbed, this information must be considered in determining the reasonableness of force used by police officers."); *Champion v.*

*Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004) ("the diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted."); *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 409 (4th Cir. 2016) ("officers who encounter an unarmed and minimally threatening individual who is 'exhibit[ing] conspicuous signs that he [i]s mentally unstable' must 'de-escalate the situation and adjust the application of force downward.'").

As for courts that have not yet incorporated disability into their excessive-force jurisprudence, the omission has had devastating implications for individuals with disabilities: officers are not held accountable for responding with force unreasonably in situations where a disability gives rise to nonnormative or unfamiliar behaviors misperceived as threatening or resistant. This in turn leads to police using more force against people with disabilities. Persisting public misperceptions fueled by fear or lack of awareness cause individuals with disabilities to be subjected to "disparate and inappropriate" treatment by law enforcement. *Law Enforcement Responses to Disabled Americans: Promising Approaches for Protecting Public Safety: Hearing on Law Enforcement Responses to People with Disabilities Before the Subcomm. on Const., Civ. Rts., and Hum. Rts. of the S. Jud. Comm.*, 113th Cong. (2014) (written testimony of Rebecca Cokley, Exec. Dir., Nat'l Council on Disability). Hundreds of Americans with disabilities die every year in

police encounters, and many more are seriously injured.  Brief of ACLU & Am. Diabetes Ass'n et al. as *Amici Curiae* Supporting Respondent at 9–19, *City and County of San Francisco v. Sheehan*, 575 U.S. 600 (2015) (No. 13-1412).

To adequately protect the Fourth Amendment rights of disabled individuals pursuant to *Graham*, this Court must incorporate disability in to its excessive-force jurisprudence. When it is known or otherwise evident to officers on the scene that an individual has a disability, "this information must be considered in determining the reasonableness of force used by police officers." *Deorle* 272 F.3d at 1283. Specifically, disability should be included as part of this Court's inquiry into the govermental interests that precipitated the use of force, including the "immediate threat to the safety of the officers or others" and "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

**B.    Failure to consider disability in the Graham analysis disparately harms Black disabled people because they are disproportionately subjected to police use of force.[2]**

Black disabled people are among those most acutely impacted by this circuit's inattention to disability in assessing the reasonableness of an officer's use of force. While there is a need for more robust data on police use of force against people with

---

[2] In absence of any consensus as to whether identity-first language (i.e., disabled individual) or people-first language (i.e., individual with a disability) should be used when referring to disabled individuals, this brief acknowledges, respects, and uses both.

multiple subordinated identies—such as Black disabled people—existing data suggests that race *and* disability influence the risk that an individual will be subjected to police violence. Elinoam Abramov*, "An Autistic Man Lives Here Cops No Excuses . . . Oh Yes He is Black Too": Cognitive Disability, Race and Police Brutality in the United States* 47–48 (Oct. 2017); Camille A. Nelson, *Racializing Disability, Disabling Race: Policing Race and Mental Status*, 15 BERKELEY J. CRIM. L. 1, 16 (2010) (discussing the criminalization of and excessive force against disabled people of color). Data suggests Black disabled people are disproportionately subjected to police use of force and injury, including death, in police encounters. Jamelia N. Morgan, *Policing Under Disability Law*, 73 STAN. L. REV. 1401, 1404 (2021). Some studies estimate that Black people make up roughly 13% of the U.S. population, yet nearly one-third (27.6%) of the total deaths caused by police officers. AMNESTY INT'L, DEADLY FORCE: POLICE USE OF LETHAL DEADLY FORCE IN THE UNITED STATES 4 (2015), http://www.amnestyusa.org/pdfs/AIUSA_DeadlyForceExecutiveSummaryJune2015.pdf (finding that Black people made up 27.6% of the victims of homicides by police officers between 1999 and 2013 despite representing 13.2% of the U.S. population). Disability also affects an individual's risk of being subjected to police use of force. It is estimated that 50-80% of the people police interact with have hidden or visible disabilities, Leah Pope & Rebecca Neusteter, *For Mental Health*

8

*Month, a New Initiative Focused on Serving Safely*, VERA, https://www.vera.org/news/for-mental-health-month-a-new-initiative-focused-on-serving-safely (May 23, 2018), and some studies suggest that as much as "thirty to fifty percent of all use of force incidents involve an individual with a disability." Karsyn Costello, *Disability As "Abnormal": Court Sanctioned Violence Against Individuals with Disabilities*, 57 HARV. C.R.-C.L. L. REV. 755, 773-74 (2022). Moreover, disabled people are overrepresented in police killings. David M. Perry & Lawrence Carter-Long, *The Ruderman White Paper on Media Coverage of Law Enforcement Use of Force and Disability*, RUDERMAN FAM. FOUND. 1, 11 (Mar. 2016), https://rudermanfoundation.org/wp-content/uploads/2017/08/MediaStudy-PoliceDisability_final-final.pdf. Data compiled since 2015 by the *Washington Post* indicate that in the United States anywhere from 20% to over half of the people killed each year by law enforcement have a disability. *Fatal Force,* WASH. POST*, https://www.washingtonpost.com/graphics/investigations/police-shootings-database/.*

Augmenting this incomplete data, in recent years there has been increased public attention to and media coverage of the fact that a significant number of victims of police violence have been Black people *with disabilities*. *See* Jamelia N. Morgan, *Disability's Fourth Amendment*, 122 COLUM. L. REV. 489, 501 (2022). Freddie Gray was a twenty-five-year-old Black man with a learning disability. *Id.*

Laquan McDonald was a seventeen-year-old Black man with PTSD and unspecified psychiatric disabilities. *Id.* Eric Garner was a Black man with respiratory disabilities. *Id.* Tanisha Anderson was a Black woman diagnosed with bipolar disorder. *Id.* 30-year-old Charleena Lyles was a prengant Black mother of three with unspecified psychiatric disabilities. *Id.* at 502. Michelle Cusseaux was a Black woman with bipolar disorder and schizophrenia. *Id.* Sandra Bland was a Black woman with depression. *Id.* Disturbingly, these individuals are but just a a handful of the hundreds of Black disabled people who were killed by police or who died while in police custody. *See* Dominic Bradley & Sarah Katz, Opinion, *Sandra Bland, Eric Garner, Freddie Gray: The Toll of Police Violence on Disabled Americans*, THE GUARDIAN (June 9, 2020), https://www.theguardian.com/commentisfree/2020/jun/09/sandra-bland-eric-garner-freddie-gray-the-toll-of-police-violence-on-disabled-americans.

As this data and the ever-growing list of victims demonstrates, law enforcement use of force against disabled people, especially Black disabled people, is a national public health crisis. *APHA Calls Out Police Violence as a Public Health Crisis*, AM. PUB. HEALTH ASS'N (June 4, 2020), https://www.apha.org/news-and-media/news-releases/apha-news-releases/2020/apha-calls-out-police-violence. Yet, this Circuit's Fourth Amendment jurisprudence has thus far ignored the role of disability in assessing whether an officer used excessive force. Consequently,

current Fourth Amendment caselaw still both fails to adequately protect disabled people against unreasonable police use of force and reinforces dominant social norms for how bodies and minds should exist in public space. *See* Morgan, *Disability's Fourth Amendment*, at 512.

> **C.  This Court should consider an individual's known or evident disability as a central aspect of the facts and circumstances of an incident when determining, under *Graham* and its progeny, the objective reasonableness of a law enforcement officer's use of force.**

The Supreme Court has long held that the determination of whether a police officer's use of force is reasonable under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. The Court has further explained that because the reasonableness of a seizure "is not capable of precise definition or mechanical application," *Graham*, 490 U.S. at 396, "its proper application requires careful attention to the facts and circumstances of each particular case." *Id.*

The question in an excessive-force case then is "whether the totality of the circumstances justifie[s] a particular sort of … seizure." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). The Court later explained that the *Graham* standard is a "test which must accommodate limitless factual circumstances." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). It follows, then, that under both the Supreme Court's decades-old    and    this    Court's    more    recent    authority,    *see*,    *e.g.,*

*Stephens v. DeGiovanni*, 852 F.3d 1298, 1315 (11th Cir. 2017), *all of the relevant facts* surrounding a police officer's use of force, seen objectively, must be considered when determining whether that officer acted reasonably.

Therefore, as other circuit courts have recognized, when it is known or otherwise evident to officers that an individual has a disability, "this information must be considered in determining the reasonableness of force used by police officers." *Deorle*, 272 F.3d at 1283. After all, "[j]ust like any other relevant personal characteristic—height, strength, aggressiveness—a detainee's known or evident disability is part of the Fourth Amendment circumstantial calculus." *Bates ex rel. Johns v. Chesterfield Cnty., Va.,* 216 F.3d 367, 373 (4th Cir. 2000).

Specifically, disability should be included as part of this Court's inquiry into the govermental interests that precipitated the use of force, including the "immediate threat to the safety of the officers or others" and "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. To fully incorporate disability in evaluating police use of force, this Court must not only carefully review all of the relevant circumstances with an eye toward disability, but it must also examine how stereotypes, myths, and generalizations may inform how the disabled person or their disability was perceived by police officers present at the scene. Critically, such analysis can inform understanding of not only how disability influenced how a particular disabled person reacted to or behaved in the presence of

12

law enforcement, but also how disability did or did not influence law enforcement's response to the individual.

> ### a. This Court should consider an individual's disability when determining whether a reasonable officer would believe the individual poses an immediate threat to the safety of officers or the safety of others.

In applying the *Graham* objective-reasonableness standard, this Court examines "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily [or psychological] harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 383 (2007)).

An individual's disability and disability-related functional limitations may undermine or make less plausible the purported immediate threat of harm the individual poses to others.[3] Functional limitations refer to behavioral manifestations of a disability, which impair, interfere with, or impede an individual's ability to perform certain functions or activities. *See National Health Interview Survey:Sources and Definitions, National Health Interview Survey*

---

[3] This argument is not meant to reinforce ableist constructions of disability but instead refers to both the societal limitations imposed on disabled individuals (*e.g.*, attitudinal, communication, physical, policy, programmatic, social, or transportation barriers) and functional limitations associated with certain disabilities.

(NHIS) and Health, United States, 2020–2021, NAT. CENTER HEALTH STAT, https://www.cdc.gov/nchs/nhis/index.htm. A functional limitation can be a difficulty with fine motor movements for individuals with congenital hand disabilities, like Mr. Jones, or may be a difficulty with mobility (*e.g.*, walking, or climbing stairs), for individuals with mobility-related disabilities. Functional limitations—whether alleviated or mitigated with accommodations or assistive devices/aids—can be evident and may impact an individual's ability to perform certain functions in a manner within the range considered typical for people without disabilities. As such, when officers perceive the behavior of a disabled individual as threatening, this Court should closely scrutinize whether—in light of *all* of the facts and circumstances, including any of the individual's known or evident functional limitations—the officer's perception is objectively reasonable.

The facts of the *Estate of Richard Lee Richards v. Remington* illustrate the importance of considering disability-related functional limitations when assessing the reasonableness of officer conduct. No. 22-cv-429, 2023 WL 2503724 (D. Ariz. Mar. 14, 2023). In 2021, a Tucson Police Department officer killed a disabled man in a motorized wheelchair. The officer asserted that the man was a threat to the safety of others. *Id.* at 3 (denying motion to dismiss). The victim, Richard Richards, had a broken hip and used a battery-powered wheelchair for everyday mobility and transportation. *Id.* at 1. Richards was suspected of stealing a toolset from a Walmart,

14

and a store clerk summoned an officer who was on site. *Id.* After Richards displayed a knife in response to being asked if he had a receipt by the officer, the officer drew his firearm and kept it trained on Richards. *Id.* Richards then proceeded to move away from the officer and toward a neighboring store. *Id.* As Richards neared the entrance to the store in his wheelchair, the officer told him to not enter. *Id.* When Richards did not stop, the officer killed him, shooting him eight times in the back. *Id.*

Although Richards possessed a small knife while he was seated in his wheelchair and ostensibly could have used the knife against the clerk, Richards did not threaten the clerk, and his functional limitiations as a wheelchair user decrease the likelihood that a reasonable officer would deem Richards an *imminent* threat to the store clerk. As the Court in *Richards* explained, the "Plaintiff's [excessive force] claim … turn[s] on whether [the officer's] conduct was *reasonable under the circumstances*, which include Richards' disability." *Id.* at 4.

Similarly, the disability-related functional limitations of Mr. Jones' hands, together with the other attendant facts and circumstances of the incident—including that Mr. Jones was not at all close to his licensed firearm, *see Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination.")—suggest that no reasonable officer at the scene

would deem Mr. Jones to pose an "immediate threat to the safety of the officers or others." An officer's subjective belief that such a threat exists is not enough to justify deadly force; the belief must be objectively reasonable and supported by the facts. *See id.* at 1219–20. Of course, Mr. Jones' disability does not preclude him from performing innumerable manual tasks with his hands, including retrieving and operating a firearm. However, importantly, just because Mr. Jones is capable of performing such tasks, it does not mean—as the district court erroneously presupposed—it is objectively reasonable to expect Mr. Jones would do so in the same manner, or with the same speed, that others who do not share his disability may. *See* Dist. Ct. ECF No. 49 (Jones Dec.) at 1 ("Ordinary hand tasks, such as using a pen, operating a phone, or opening a car do are all possible, it just takes me much longer than someone without my handicap.").

Here, the evidence taken in the light most favorable to Mr. Jones demonstrates that at the time Officer Ceinski used force against Mr. Jones, an objectively reaonable officer at the scene would not believe Mr. Jones posed an immediate threat to Officer Ceinski. Evidence in the record demonstrates it was evident Officer Ceinski was aware Mr. Jones is disabled, *see Jones*, Dist. Ct. ECF No. 49 at 2, that he was standing outside his vehicle, *id.*, and that he made no attempts to retrieve his licensed firearm from the vehicle. *See Jones*, Dist. Ct. ECF No. 41 at 10–11. Taken together, these circumstances did not require Mr. Cienski to make the type of "split-

16

second judgements" contemplated by the *Graham* Court, *Graham*, 490 U.S. at 396–97, nor would they lead a "reasonable officer on the scene at the time the events unfolded" to believe Mr. Jones posed an immediate threat. *See Garczynski v. Bradshaw,* 573 F.3d 1158, 1166 (11th Cir.2009).

Relatedly, because law enforcement officers—like society, more generally—may interpret nonnormative behaviors that are innocuous as threatening, law enforcement officers may react with force unnecessarily when interacting with individuals whose disabilities manifest nonnormative behavior. Many disabilities, both physical and mental, generate behaviors that may be pereceived as threatening but are entirely harmless. Individuals with (untreated) psychiatric disabilities, for example, may manifest symptoms like active psychosis, erratic movement, or hallucinations that are benign but misinterpreted as violent, threatening, or dangerous to officers or others. Morgan, *Disability's Fourth Amendment*, at 556-57. Manifestiations of other disabilities, such as autism, also may be misinterpreted as threatening. One common behavior of people who have an autisim spectrum disorder is a self-stimulating behavior known as "stimming." Ann Pietrangelo, *Stimming: Causes and Management*, HEALTHLINE (June 28, 2019), https://www.healthline.com/health/autism/stimming. Stimming usually involves repetitive movements or sounds. *Id.* For an officer who does not understand or is not familiar with involuntary movements like stimming, fidgeting, or swaying or

flapping, they may interpret the involuntary movement as an attempt to lunge toward the officer or reach for a weapon. In response, officers may then escalate the situation by shouting commands, in some cases with weapons drawn, in an effort to regain control and force compliance. Morgan, *Disability's Fourth Amendment*, at 558.

> **b. This Court should consider an individual's disability when determining whether a reasonable officer would believe the individual was actively resisting arrest or attempting to evade arrest by flight.**

When this Court does not account for an individual's disability in its assessment of whether a reasonable officer would believe the individual is actively resisting arrest (*i.e.*, the person is noncompliant or resistant) or attempting to evade arrest by flight, it fails to consider how certain disabilities may render a person unable to comply with law enforcement due to a physical inability, lack of understanding, or diminished capacity. As the Police Executive Research Forum ("PERF") has stated, "officers may believe that an individual is willfully disobeying their commands, when in fact the person is unable to comply because of illness or disability." *Critical Issues in Policing Series: An Integrated Approach to De-Escalation and Minimizing Use of Force*, POLICE EXEC. RES. F. 1, 1 (Aug. 2012), https://perma.cc/G5T8-ZRBW. If officers misinterpret disability-related behaviors as active or passive resistance while they are attempting to effectuate an arrest, this perceived noncompliance may then furnish a basis for use of force.

18

For instance, perhaps the starkest examples of disability-related behaviors being misinterpreted by officers as noncompliance are cases involving deaf individuals arrested or subjected to force for non complying with officer commands. *See*, *e.g.*, *McCray v. City of Dothan*, 169 F. Supp. 2d 1260, 1269–70, 1275–76 (M.D. Ala. 2001) (finding officers knew plaintiff was deaf and could not read lips, but perceived him as uncooperative; officers slammed plaintiff's head on a restaurant table hard enough to break it, used a painful chokehold on him, forcibly removed him from the restaurant, and arrested him), *aff'd in part, rev'd in part, on other grounds*, 67 F. App'x 582 (11th Cir. 2003) (reversing grant of qualified immunity on excessive-force claims); *see also Lewis v. Truitt*, 960 F. Supp. 175, 178–79 (S.D. Ind. 1997) (describing how police beat and arrested a deaf plaintiff whom they "refused to believe" was deaf and whom they accused of "lying" about his disability). As such, courts should carefully interrogate an officer's labeling of an individual as noncompliant or resistant when the use of force involves a person with a disability.

## Conclusion

For the foregoing reasons, this Court should consider Mr. Jones' disability in assessing the reasonablenss, or lack thereof, of Officer's Ceinski's use of force and reverse the district court's grant of Officer Ceinski's motion for summary judgment.

Dated: December 6, 2023                    Respectfully submitted,


                                           */s/ Daniel Tilley*
                                           Daniel Tilley
                                           American Civil Liberties Union
                                           Foundation of Florida
                                           4343 West Flagler St. Suite 400
                                           Miami, Florida 33134
                                           (786) 363-2714
                                           dtilley@aclufl.org

                                           Julian Clark
                                           American Civil Liberties Union
                                           Foundation
                                           Criminal Law Reform Project
                                           125 Broad Street, 18th Floor
                                           New York, New York 10004
                                           (929) 969-4365
                                           jclark@aclu.org

                                           *Counsel for Amici Curiae*

## Certificate of Compliance with Word Limit, Typeface Requirements, and Type-Style Requirements

The undersigned certifies that this *amicus* brief complies with the word limit of Fed. R. App. P. 29(a)(5) and Circuit Rule 29 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 5582 words as shown by Microsoft Word.

The undersigned certifies that this *amicus* brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) and Circuit Rule 32 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font that is 14 points in the body and footnotes of the brief.

Dated: December 6, 2023                    By:    */s/ Daniel Tilley*
                                                                        Daniel Tilley